[No. 1025, June 27, 1905.]

FELICIANO CANDELARIA, et al., Appellees, v. SERAPIO VALLEJOS, et al., Appellants.

Appeal from the district court of Dona Ana county, before FRANK W. PARKER, Associate Justice. Affirmed.

BONHAM & HOLT, for appellants.

No authorities cited except Territorial statutes.

E. C. WADE, for appellees.

Community ditches under the New Mexico statutes are involuntary quasi corporations; public in nature and use.

> 15 Eng. & A. M. Enc. of Law, (1st Ed.)
> p. 955; 1 Beach on Public Corporations, Secs.
> 3 and 4; Eliott on Municipal Corporations,
> Secs. 3-4-71 and 72.

Such corporations are not liabe for torts.

> Elmore    v.    Drainage    Commissioners,
> 135 Ill. 260; 1 Beach on Public Corporations.

Candelaria v. Vallejos.

An irreparable injury is not necessarily such an injury as is beyond the possibility of reparation or compensation in damages.

> 10 Eng. & Am. Enc. of Law (1st Ed.) p. 837.

### SYLLABUS.

1. In 1875, the ditch here involved was established and constructed as a community ditch for the purpose of supplying water to plaintiffs and defendants and others owning lands within reach thereof. The course of the main ditch as thus originally established was adhered to up to 1903, when defendants as commissioners thereof, and acting under resolution of a majority interested in said ditch, but over the objections of the minority, abandoned the ancient ditch and located said main ditch about a half a mile from the old main ditch, whereupon plaintiffs constituting said minority prayed an injunction to restrain the maintenance of said new ditch as the main ditch of said community. Held that under the allegations of damage in the complaint the injunction was properly granted.

2. The right to have the original community ditch run through or near the lands of plaintiffs upon its ancient course, was a property right in plaintiffs secured by the original mutual understanding by which the ditch was constructed upon such course.

3. By entering into such community enterprise plaintiffs did not vest in the majority interested in said ditch the power to change at will to plaintiffs' damage, the ancient course of said ditch, but such change could (except as hereinafter indicated) be effected only by the method necessary in the case of any other property, to-wit., by the consent of the owner thereof.

4. The act of February 28, 1895 (C. L. Secs. 8-14), construed and held that the ditch corporations thereby created were involuntary public quasi-corporations, with no powers except those expressly conferred by statute or such as were impliedly necessary to the performance of those statutory powers.

Candelaria v. Vallejos.

5. The act last cited does not confer upon the officer or majority interested in the ditches thereby incorporated, any powers as to changing the ancient course of the same against the consent of owners to be injuriously affected by such change.

6. While under the original community plan and under the corporation which succeeded it, no power was vested in the majority to change at will the main ditch so as injuriously to affect the rights of a minority, except by the consent of such minority, where the maintenance of a ditch becomes a practical impossibility, this rule does not obtain and such main ditch may under the circumstances last named be changed to an extent sufficient to avoid such insuperable obstacle.

7. The principle last stated rests not upon any power to detract from property rights upon the ground of necessity, but upon the ground that under the original understanding by which the ditch was built, all parties must be presumed to have consented in advance to a modification of the original course of the ditch, should such thereafter ever become absolutely necessary to the continued existence of the community enterprise.

8. O. L. Sec. 5, providing "that the course of ditches or acequias established, shall not be disturbed," construed and held to render unalterable the course of community ditches where the continued existence of the same upon the old course has become practically impossible.

9. The mere fact that the expense of inconvenience connected with the use of the old ditch is greater than would be present upon some other course will not under the rule above stated justify a change. The difficulties justifying such a change must amount to a practical prohibition upon the further maintenance of the old ditch.

10. The facts alleged in defendants' answer, when measured by the rule last stated, are not sufficient to justify the change attempted by the defendant commissioners and the demurrer to such answer was properly sustained.

## STATEMENT OF FACTS.

This is a suit instituted in the court below by Feliciano Candelaria and sixteen others against Serapio Vallejos, Efren Duran, and Filomeno Jaramillo, as commissioners of the Acequia Madre of Colorado and Santa Teresa.

As the disposition of the case turns on the pleadings, these will be fully outlined. The complaint in substance alleges that the acequia just mentioned is a community ditch established and constructed in 1875 to irrigate the lands of complainants and other residents of the towns of Colorado and Santa Teresa, and that it has been ever since and is now managed, operated and maintained under and in conformity with the statutes of the Territory regulating community ditches; that plaintiffs own and possess, severally, tracts of farming land thereunder and water rights therein entitling them and each of them severally upon equal terms with all others of such owners of land under said ditch to the use of the water flowing in said ditch for the irrigation of their several tracts of land; that the main ditch has its course from a point in the Rio Grande in Precinct 12 of the said county and thence through the low lands of the valley of said river and through Precincts 12 and 16 to a point below, on or near the said river; that there is a certain lateral ditch, constructed by persons owning lands and rights for irrigation under the main ditch, said lateral ditch having its source at a point on said main ditch about five miles from the mouth thereof; running thence on high ground northwardly of and generally parallel with said main ditch to a point about six miles below where it united with the main ditch; that the defendant commissioners on or about May 1, 1903, at a meeting held by them as such, determined, against plaintiffs' protest, that said so-called lateral ditch should henceforth be and be operated, managed and maintained as the main ditch, that said commissioners would henceforth refuse to assess or require fatigue work or task for the maintenance of so much of the main ditch as lies between the intake and point of discharge of the so-called lateral, and would thenceforth refuse to clear,

repair, operate, manage and maintain said portion of said main ditch, but would leave the same to be operated, managed and maintained by and at the sole expense of those persons irrigating therefrom; that they would assess and charge the plaintiffs and all other owners of land under said main ditch and against their said tracts of land the expense of managing, operating and maintaining said lateral, and of distributing water therefrom and would give or cause to be given credit on the books of said community ditch, to all persons performing or contributing work on said lateral as for so much work done on the said main ditch, and would issue and deliver to all such persons receipts in accordance with such credits. The complaint further alleges that the defendants threaten and intend to deny and refuse water from said community ditch to all who refuse to perform or contribute work for said lateral ditch, and also threaten and intend to arrest and prosecute plaintiffs in case they persist in a refusal to acquiesce in defendant's' unlawful acts, thus subjecting plaintiffs to great annoyance, loss of time and expense. They also allege that said commissioners during the construction of said ditch, diverted unlawfully and without plaintiffs' consent a large amount of the funds of the community ditch contributed solely for the maintenance thereof, to the promotion and construction of said lateral ditch and threaten to divert other funds to the maintenance of said lateral ditch, thereby occassioning loss to said community ditch; that plaintiffs are small farmers, dependent entirely on cultivation of tracts of land situated on both sides of the section of the main ditch here involved, with growing crops thereon which will become wholly lost if defendants' threats and intentions are carried out; that some of said tracts are so situated that it is a physical impossibility to irrigate the same from said lateral ditch, while to irrigate other tracts from said lateral will require great expenditure of time and money by plaintiffs in the construction of new laterals, which expense plaintiffs are unable to bear; that unless defendants shall be enjoined from said acts, great confusion and uncertainty will arise in the affairs of said ditch, the proportionate burden and expense

of plaintiffs in maintaining said community ditch and in
providing water for irrigation will be greatly increased,
their crops will be lost, their lands depreciated in value
and "they will suffer great and irreparable injury." There
is an allegation that "defendants are insolvent and irre-
sponsible."   The complaint prays for an injunction re-
straining the defendants, (1) from making and constitut-
ing said lateral ditch as the main ditch or operating, man-
aging or maintaining it as such; (2) from failing or re-
fusing to assess fatigue work for the clearing, repairing
and maintenance of said main ditch; and from failing or
refusing to clean, repair, operate, manage and maintain
said main ditch; (3) from assessing or charging to plain-
tiffs or others owning lands and rights of irrigation under
said main ditch or to their lands any fatigue work con-
nected with the said lateral ditch; (4) from failing and
refusing to assess ratably and equally for the maintenance
of the main ditch; (5) from issuing or permitting to be
issued any receipts or credits for work done on said lateral
ditch as for fatigue work done on the main ditch; (6)
from applying any money or labor contributed for the
main ditch to be applied to the lateral ditch; (7) from
withholding water from plaintiffs because of their re-
fusal to contribute toward the lateral; (8) and from ini-
tiating criminal prosecutions against plaintiffs for taking
water ratably and proportionately, simply because they may
have failed to contribute to such lateral ditch.

The defendants filed their answer in which they ad-
mitted that the main ditch was established and constructed
and originally had its course as alleged, but averred that
upon April 18, 1903, at the request of a large majority
of the owners of the said ditch, among them Feliciano
Candelaria, one of the plaintiffs, but against the wishes
and protests of the other plaintiffs, the portion of the
main ditch described in the complaint was, by resolution
of defendants, abandoned as such and the lateral ditch
adopted in lieu thereof as a portion of said main ditch,
and that since said date said lateral ditch had been main-
tained, operated and controlled by defendants as such main
ditch; that the action of April 18, 1903, was at a meet-
ing held by defendants, as such commissioners, after no-

tice to all owners of water rights in said main ditch and on the petition of a large majority of said owners, and after a full hearing and "with full right and authority so to do." A copy of the resolution adopted by said commissioners at the meeting of April 18, 1903, is attached to the answer. Defendants deny that plaintiffs have been deprived of their share of the water flowing in the main ditch, and deny that they have made any threats of crimi-. nal prosecution against plaintiffs or any of them. They further deny that they intend to deprive plaintiffs or any of them of water from said community ditch "so long as the said plaintiffs comply with the rules and regulations provided by law which entitle them to water from said main ditch and do the necessary fatigue and assessment work thereon," and deny that any of plaintiffs' tracts of land are so situated that it is physically impossible to irrigate the same from the main ditch as constituted by the resolution of April 18, 1903, but aver that all the land hitherto irrigable from the old main ditch can still be and is now being irrigated from the main ditch as now constituted, and that in no instances will the extension of the lateral ditches necessary for irrigation under the new system have to be for a greater distance than about one-half mile, and they further deny that the construction of said new laterals will necessitate the expenditure of money or labor beyond what plaintiffs are able to bear. Defendants further deny that any of the money of the community ditch was used on the new ditch, and deny that they threaten or intend to divert wrongfully any funds in the maintenance of the so-called lateral ditch; averring, however, that they intend to use and apply funds coming under their control as commissioners in the maintenance of said so-called lateral as a part of said main ditch. There is further a denial that there is danger of any confusion or uncertainty in the affairs of said ditch, or that the proportionate burden and expense of plaintiffs or any of them will be greatly increased by the new arrangement, or that they will lose their crops, or that their lands will depreciate in value, or that they will suffer great or irreparable injury, and they also deny that they or the corporation represented by them is insolvent or

Candelaria v. Vallejos.

irresponsible. Further answering defendants admit that the ditch in controversy was established, constructed and maintained as alleged; that in the year 1895, under the statutes of said Territory it became a corporation and ever since has been and now is managed, operated and maintained as such under the name of the Acequia Madre of Colorado and Santa Teresa; that said main ditch between points in controversy is intersected and traversed by a large arroyo having its source a number of miles above the point of such intersection, and that for many years last past, during the rainy season, the flood waters of this arroyo have frequently washed out said main ditch and completely destroyed portions of said ditch and crops growing upon the lands embraced within the flooded district; that said floods have been so frequent "as to render it practically, if not entirely, impossible to maintain said main ditch between the points referred to as the same would no sooner be repaired than another flood would destroy it"; that the frequent repairs and the frequent destruction of crops has entailed great loss upon the owners thereof, and great loss has also been incurred by reason of the inability of the owners to obtain water for their crops during the periods when said portion of said ditch was so destroyed; that the so-called lateral ditch was constructed prior to April 18, 1903, by consent of the owners of said community ditch and upon higher ground then the corresponding portion of the old main ditch, and is so located as to prevent its being damaged by the flow waters from said arroyo; that about the first day of April, 1903, there was presented to defendants as commissioners a petition signed by ninety-four of the owners in said ditch, being over eighty per cent of said owners, praying said defendants to call a public meeting of all of said owners to determine by majority vote, whether the portion of the old main ditch in controversy should be abandoned as such and whether the said lateral ditch should be adopted as a portion of said main ditch in lieu thereof, and that Feliciano Candelaria, one of the plaintiffs, joined in and signed said petition; that pursuant to said petition the defendants called a public meeting of the owners in said community ditch to be held in the said

town of Colorado on April 18, 1903, and gave public no-
tice thereof; that said meeting was attended by a large
majority, if not all, of the plaintiffs, and it was then and
there decided by the votes of a majority of those present
and a majority of the interests in said community ditch,
to abandon the portion of the old ditch here involved and
to adopt in lieu thereof the said so-called lateral, and
that the defendants then and there adopted a resolution
providing that the lateral ditch aforesaid was thenceforth
to be operated as a part of the main ditch, and the said
abandoned portion of the main ditch was to be made a
lateral ditch. Copies of said petition and resolution are
attached to the answer as a part thereof. Defendants fur-
ther aver that said action was for the purpose of decreas-
ing the expense of maintaining said main ditch, and in
order to avoid the loss and damage by reason of floods as
aforesaid; that said action has been beneficial to a large
majority of the owners of said main ditch and has enabled
the majority, if not all, of the plaintiffs to irrigate more
land than under the main ditch as it was maintained prior
to April 18, 1903; "that plaintiffs are now enabled to
irrigate all of the lands which they could irrigate prior
to the action aforesaid and with equal if not greater facili-
ty than they could from the abandoned portion of said
main acequia; that in fact some of the plaintiffs are now
irrigating more land than they did prior to the change
referred to, and some tracts which they were absolutely
unable to irrigate from the ditch as formerly maintained;"
that said lateral ditch is shorter and straighter than the
abandoned ditch, and this fact as well as its immunity
from floods make the cost of maintenance much less than
previously; that said new ditch is at no point more than
about one-half mile from the main ditch and that laterals
can be extended therefrom to plaintiffs' lands at compara-
tively small expense and that plaintiffs can utilize the
abandoned portion of said ditch as a lateral and thus irri-
gate with the same facility as prior to April 18, 1903,
and indeed with additional facilities, as said new portion
of said main ditch enables them to irrigate lands not for-
merly irrigable. It is further alleged that to maintain
longer said abandoned portion of said main ditch will en-

Candelaria v. Vallejos.

tail loss and expense upon the great majority of the own-
ers in said ditch which they are unable to bear, and that
by reason of the frequent injuries to said abandoned por-
tion and to their crops by reason of its partial destruc-
tion from time to time, such majority owners will be irre-
parably injured. The petition for a change of the ditch
referred to and made a part of the answer, presents a num-
ber of reasons for the change more or less intelligible,
but the damage to the old ditch by reason of floods is not
among the reasons set up. The resolution adopted like-
wise fails to mention this as a reason for the change.

The answer was demurred to upon a number of
grounds and after an amendment by defendants, setting
up the fact that all of the defendants' acts were done
upon the petition, at the request and in accordance with
the votes of the persons owning a majority interest in said
acequia, the demurrer to said amended answer was sus-
tained, and defendants electing to stand upon their answer,
the court entered judgment enjoining defendants as prayed
with respect to the new ditch, but denying without preju-
dice the relief prayed as to the maintenance and operation
of the old ditch upon the ground that an adequate remedy
at law, to-wit, by mandamus, existed, to enforce the per-
formance of defendants' duty in that respect. Whereup-
on defendants sued out an appeal to this court.

OPINION OF THE COURT.

POPE, J.—(After making the foregoing statement of
the case). The question standing at the very threshold
of this controversy is, what was the understanding
under which the ditch whose course it is now sought
to change was laid out? The pleadings upon this
point are very meager. The answer alleges simply that
the ditch in question was established and constructed
about the year 1875 for the purpose of supplying water
for the irrigation of the lands within reach thereof, be-
longing to and cultivated by the owners of water rights
in said ditch and that it has ever since been and is now
managed, operated and maintained in accordance with the
territorial laws regulating community ditches. We are
not informed by the pleadings as to any specific terms

and conditions under which the ditch was built and we are remitted to general understanding and local custom for the ascertainment of the meaning of the term community ditch as here used. Indulging judicial notice upon this point to the extent permissible and viewing the allegations in the light of local custom we conclude that this initial transaction was as follows: "In 1875 there were at or near the towns of Colorado and Santa Teresa, in Dona Ana county, a number of owners of land, among them the plaintiffs or their predecessors in the title of the tracts here involved; that said owners recognizing the comparative worthlessness of their lands unless watered, agreed among themselves to construct by joint energy and joint capital the ditch in question, running along the course it had prior to the change now complained of; that such course was the result of mutual agreement and mutual concession, designed to yield the best results to the community as a whole and to each of the land-holders in the cultivation and improvement of his particular holding; that subject to a possibility to be hereafter discussed, the arrangement thus made and the course of the ditch thus agreed upon was to be for all time, unless modified by mutual and unanimous agreement; that relying upon this arrangement and the permanence of the ditch thus established by the community effort, each of said land-holders proceeded to cultivate his tract, and in some instances to place upon his holding improvements representing the sum total of his earthly belongings. The result of this arrangement, which is a part of the local history of every community ditch in this Territory, was to invest each tract of land held by the holders of this ditch, with a certain valuable appurtenance, to-wit, a ditch running through or near it upon definite course, delivering a certain amount of water at a cost to said owner of a certain justly proportioned amount of fatigue work, toward the maintenance of said ditch. The land, of course, was property of the highest kind, but equally was the presence of the ditch and the yielding from it of a certain fixed amount water property, for it was the presence of this ditch and the presence of this water that made the land of value and differentiated it from millions of acres of comparatively

Candelaria v. Vallejos.

valueless land in the arid West. Each owner under this mutual arrangement continued to enjoy the possession of his property and of its appurtenant water until April 18, 1903, when the ditch commissioners decided that the ditch shall no longer run where it ran before, but that for six miles of its length it shall run about a half a mile from the old course and thus through an entirely different series of tracts of land from that over which it was originally laid out. The effect of this is to change materially the water facilities appurtenant to the tracts in the strip of six miles along the old ditch. These tracts, instead of being watered from the old ditch maintained by the community, must now be watered either from the old ditch maintained as a lateral at the expense of the owners in the six mile strip or by laterals run at great expense from the new main ditch. The effect of this is to place upon the owners of these tracts a burden which they did not have under the original agreement; if they irrigate from the old ditch it must be by keeping that ditch up at their own expense, meanwhile contributing to the new; if they irrigate from the new ditch it can only be by building new laterals, if perchance they have the means to build and maintain such. If they are without means to maintain or construct such laterals they are forced to the comfortless alternative of getting along without any water at all. The effect of this in its most favorable alternative is directly to increase the burden upon the tracts worked by them or stated conversely to diminish directly the value of those tracts by diminishing or taking away that which alone gives value to the land. To do this in effect is to ignore the mutual agreement originally entered into between all the parties fixing the ditch upon a definite course; it is to take way to a certain extent the value of property which has been improved in reliance upon that agreement. Each of these being done against the will and over the protest of the plaintiffs, who were parties or privies to the original agreement creating the community and are owners of the property whose value it is thus sought to diminish or destroy, can this action on the part of the commissioners be upheld in due regard to

Candelaria v. Vallejos.

the sanctity of contract; Can it be harmonized with the constitutional provisions against the taking of property without due process of law? Let us see what justification the defendant commissioners offer for their action. We shall first consider the matter upon the same basis as is disclosed by the petition of the majority owners to the meeting of April 18, 1903, that is to say, without reference to the presence of any difficulty in maintaining the ditch on account of floods. Defendants in the first place allege in brief that their resolution making the change was upon the petition of a majority of the interests in the ditch, who, at the meeting called for that purpose, voted for such change. Do these facts justify the action complained of? We think not. We find nothing in the pleadings nor in the custom of community ditch organizations to justify the conclusion that the will of the majority of the interests on a given ditch can, over objection of those affected thereby, arbitrarily change its course, or otherwise modify the agreement which placed it at a particular point. If it takes two, or three, or ten to make a bargain, it takes equally that number to abrogate one. There is nothing in the fact that plaintiffs or their predecessors by unanimous understanding entered into a community to build a ditch upon a certain course, to justify the conclusion that such an agreement carried with it the power on the part of the majority to take away the ditch from the lands of the minority and run it across entirely different lands A mutual contract would have little value if it conferred upon a majority of its participants the right to vary its terms at any time, without regard to the wishes of all concerned If a contract possesses any sanctity that sanctity is invokable for the protection of all parties to it. By entering into such an agreement the owner of land cannot be presumed to have abdicated to a majority of his associates the power to take away from him all of the benefits flowing from such contract and to have vested in others the power to ruin him. If the power here claimed for the majority existed, it existed equally to change the course of the ditch, not only beginning at a point five miles from its intake, but also from a point immediately at its intake. That power

Candelaria v. Vallejos.

once conceded becomes a power to divert it from its
course not only for a distance of six miles but for the
whole length of the ditch; to cause the new course to be
not only a half mile from the old ditch, but as many
miles as the will of an arbitrary majority may decide.
True, any such action would still leave the owners of
the tracts the privilege of constructing,' if topographical
conditions permitted, miles of laterals at their own ex-
pense to conduct water to their lands, or what is the
same thing, to maintain miles of the old ditch for that
purpose; true, the majority do not confiscate the water
belonging to the minority, they simply destroy or ren-
der prohibitively expensive the means of conducting the
water to the lands of such minority; true, they do not
say, 'you no longer have any water rights,' they simply
say: 'Here is your water; come across these intervening
miles, tunnel these intervening hills, bridge these inter-
vening arroyos as best you can and take it.' We are un-
able, however, to distinguish between a confiscation which
is effected by direct act and that effected by prescribing
conditions impossible of fulfillment.   If majority land-
owners may do this, they thereby annul the original agree-
ment, by which in consideration of plaintiff's and in con-
structing this ditch, the water was to be held for his use,
not miles away, whether he be financially able to go and
get it or not, but was to be delivered at the very door step
constructed in reliance upon the mutual compact and upon
the very land for whose improvement the ditch was con-
structed.   As we have before said, we cannot find any-
thing in the allegations of the answer, or in the customs
connected with the organization of community ditches
that leads us to conclude that by going into such project
originally the plaintiffs or their predecessors in title or
either of them surrendered the right to direct his own af-
fairs and to control his own property; or that he pooled
all his property rights with his associates in the communi-
ty in such a way as to give a fickle or perhaps tyrannical
majority absolutely the power to take away that which
renders his holding valuable.   We are of opinion that
under that system he remained as any other citizen vested

with full rights of property, sacred against any alienation except by his consent or by due process of law.

It is contended, however, that conceding it to be true that these were the conditions under which the water 4 interests were held from the organization of the ace- quia in 1875, and for some years subsequent, this was all changed by the legislation of 1895, making com- munity acequias corporations and investing in three com- missioners elected by a majority of the interests in the ditch, the full control of the affairs thereof, and in a mayordomo, similarly elected, the discharge of the execu- tive duties thereof. (C. L. Sec. 8, et seq.)

This involves a consideration of the act of February 28, 1895, for the first section of that act, (C. L. Sec. 8) provides:

"All community ditches or acequias, now constructed or hereafter to be constructed in this Territory, shall for the purpose of this act be considered as corporations or bodies corporate, with power to sue or to be sued as such."

Section 2 provides (C. L. Sec. 9), that the officers of such community ditches shall consist of three commis- sioners and one mayordomo or superintendent, each of whom shall be the owner of an interest in said ditch or the water therein. By Section 3 (C. L. Sec. 10) at elec- tions for these officers only those having water rights in the ditch shall be allowed a vote; but votes may be cast by written proxy and shall be in proportion to the interest of the voter in the ditch or water, or in proportion to the number or amount of his water rights. Section 4, as amended by Chapter 44 of the Session Laws of 1897, (C. L. Secs. 11), and Chapter 44, Sec. 1, of the Laws of 1903, is as follows:

"The commissioners shall assess fatigue work or task of all parties owning water rights in said community ditches or acequias, and shall have power to contract or be contracted with and also to make all necessary assess- ments to provide funds for the payment of the salary of the mayordomo and other legitimate expenses incident to the proper conduct and maintenance of the acequias under their charge, and also to make contracts for obtain- ing water for irrigating purposes in connection with their

ditches, such contracts to be ratified by a vote of a majority of the owners of water rights in said ditches, and shall have general charge and control of all affairs pertaining to the same, together with the power to receive money in lieu of said fatigue or task work at a price to be fixed by them, and shall, immediately upon taking office, provide by-laws, rules and regulations not in conformity with the laws of the Territory for the government of said ditch or acequia, and a printed copy thereof shall be furnished to each owner of a water right in said ditch.

The remainder of Section 4 as amended, defines the duties of the mayordomo, prescribing that he shall, under the direction of said commissioners, be the executive officer of said ditch, superintending all work thereon and the distribution of the waters, with power to collect fines and amounts to be paid in lieu of fatigue or task work, and to perform such other duties in connection with the ditch as shall be prescribed by the commissioners, or by the rules and regulations. In the remainder of the act are definitions of the penalties imposed. It is contended that by this action, the legislature gave to the various owners in the ditch the attributes of stockholders, to the commissioners the power of directors, and that in the exercise of these powers the course of a ditch may, by a majority vote of said so-called stockholders and directors, be changed, no matter how disastrous may be consequences to the minority. As producing this result special emphasis is laid upon the words in Section 11, providing that "the commissioners shall have general charge and control of all affairs pertaining to the same." It is to be noted, however, at the very outset, that the corporation which the legislature has thus created out of each community ditch in the Territory is in no sense a voluntary corporation. The investiture of corporate functions is not even made permissive. The legislature says that such ditches "shall be considered as corporations," and this result follows equally whether all or none of these interested in such ditch desire it to become a corporation. The corporation thus created is not endowed with the general powers pertaining to corporations. It has only the powers expressly or by necessary implication granted to it by

the act creating it and no more. It belongs to the class of corporations known as public involuntary quasi corporations. This character of corporation is discussed in Elmore v. Drainage Commissioners, 135 Ill. 269, 273, where it is said:

"In regard to public involuntary quasi corporations the rule is otherwise, and there is no such implied liability imposed upon them. These latter—such as counties, town-ships, school districts, and other similar quasi corpora-tions—exist under general laws of the state which appor-tion its territory into local sub-divisions for the purpose of civil and governmental administration and impose up-on the people residing in said several sub-divisions pre-cise and limited public duties and clothe them with re-stricted corporate functions, co-extensive with the duties devolved upon them. In such organizations the duties and their correlative powers are assumed *in invitum.*"

The case stands upon a footing very different from a voluntary corporation organized for gain, wherein a ma-jority of the stockholders and the board of directors chosen by such stockholders, are invested by law with wide discretion and ample powers as to the manage-ment and alienation of the property of the corporation. There the interests of individuals formerly held in sever-alty become fused into one body, known as the corporate property and the individual holdings become merged into certificates of stock. Here, however, this was no vol-untary organization; the owners of these lands and the water rights appurtenant thereto were not given leave to incorporate, as a preliminary to which they deeded their several holdings to the corporation. On the contrary, the legislature for the purpose purely of more convenient-ly and economically distributing the water upon such lands and thus perhaps of leaving by such economical use an overplus for new appropriations, decided to make corporations out of each of the ditches. The leg-islature did not take away or diminish any property rights previously held by the several owners, nor could it do so. The same constitutional protection which would prevent the legislature by direct act from taking the property of a citizen without his consent, without just

compensation being provided therefor, would prevent its doing so indirectly. As it could not by its fiat confiscate the property of the citizens, it could not by creating a corporation and officers thereof confide to such corporation the power to confiscate property. Alienation of property depends upon the consent of the citizen or upon the condemnation for public use, accompanied by due compensation and it was not within the power of the legislature by creating corporations as in the act of 1895, to wrest from an individual the ownership and management of highly valuable property and to confide such to a majority of his associates in an enterprise. We do not believe, however, that this was the purpose of the legislature of 1895, and the subsequent legislation amendatory thereof. We are of opinion that the sole effect of these acts was to create a public corporation with power as indicated by the above quoted authorities, restricted simply to the exercise of those functions necessary to the ends of the law. Indeed this is all the original act provides, for it says in terms that such ditches are incorporated "for the purpose of this act." These purposes, as we have seen, are in brief, properly to conduct and maintain through its officers the acequias under their charge with the power to contract and be contracted with for this particular purpose, and with the power to make assessments upon the coparcerners for the necessary expense of such ditch, including the salary of the mayordomo, and also with the power to receive cash in lieu of the assessments. It is true that the act also provides, as appellant points out, "that such officers shall have general charge of all affairs pertaining to the same." Whether the words "the same" refer as contended by appellants, to the ditch, or, as contended by appellees, to the particular matters relating to the ditch enumerated in the statute, the result is the same, and that is, that the general charge and control conferred by the statute is simply as to those matters which are incident to the orderly and economical government of the ditch as organized. They do not disturb property rights as they previously existed in the various coparceners, they do not disturb or destroy priorities as they existed before the statute of incorporations, they do not give the power

to take away from one the water belonging to him and to give it to another, and they do not, in our judgment, place it within the power of a majority of the owners, or in the powers of mayordomos or commissioners arbitrarily to withdraw a main ditch from land which has always enjoyed its ministrations.

We have, heretofore, considered this case in the light of the possibilities which might flow from the arbitrary or tyrannical act of a majority of the ditch owners in changing its course against the will of the minority. We come now to consider the case in the final aspect under which it is presented by appellant, which is, that assuming that neither the original community understanding nor the incorporation act of 1895, gave the power to change the course of the main ditch *unnecessarily,* such power exists where by natural causes the maintenance of the ditch on its old course has become an impossibility.

We are not disposed to question the applicability of **6** this rule in the proper case, and we do not concur in the view advanced by appellees upon this point, that section five of the Compiled Laws fixes irrevocably the *locus* of a ditch once established. That section enacted in 1851 provides that "the course of ditches or acequias already established shall not be disturbed." This section was enacted primarily for the protection of ditches from outside trespassers and was intended as a guarantee against the destruction or disturbance of ditches then in existence and has no application to ditches thereafter constructed. We are of opinion that in the establishment of all community ditches it was within the contemplation of the parties and was one of the underlying conditions under which the community enterprise was proceeded with, that should at any time the maintenance of any portion of the ditch constructed become by act of God or other overruling necessity, a physical impossibility, a modification of the original plan sufficient to meet this new state of facts was to be permitted. The ditch having been constructed for the benefit of all, the absolute impossibility of maintaining a portion of it should not result in the abandonment of the whole enterprise because the owner of the land upon which the change was to be made might

Candelaria v. Vallejos.

object to such change. Such a right would be at variance with this whole theory upon which such ditches were constructed in this Territory. We so hold not because it is generally speaking within the power of any one to take away from another that which is his simply because that result will conduce to the good of others similarly situated, but for the reason that the right to stand in the way of others to the destruction of their rights, as well as his own, was never within the original understanding for the building of the ditch. It must be presumed that when he entered into this original agreement he understood and agreed that his enjoyment of the right was subject to this overpowering contingency. In entering into this association he cannot be assumed to have looked forward to playing the "Old Man of the Sea," to his associates or to the common enterprise. By this view we take nothing from him that was his by the original understanding, but we hold that that understanding properly construed gave him no such right. If in any case, therefore, it is demonstrated that it is absolutely impossible to maintain the ditch upon the old lines and the alternative presented is the necessary abandonment of the entire enterprise, we would have no difficulty in holding that this latter result need not follow, but that the course of the ditch may be modified to meet and obviate the insuperable obstacle, and this whether any particular owner at the time objects or not. Any expense and hardship incurred upon such objecting owner in adjusting himself to such necessary change would, we may say in passing, be presumably considered in his favor by the ditch authorities thereafter, in the exercise of their wide discretion as to the apportionment of labor and expense of such ditch.

The views we have here expressed find support not only in reason and local history, but in our judgment are sustained by a distinct legislative declaration upon the subject. By the act of 1866 (C. L. Secs. 25-27) the legislature of the Territory provided for the re-establishment of ditches once destroyed. The wording of the act is instructive. It is therein provided that "when any public ditch, or part thereof, shall be destroyed by rain

or in any other manner, and it shall be *absolutely impossible* to reconstruct it where it usually ran before it was destroyed, the mayordomo of such ditch with the consent of the majority of the common' laborers of the same, should they deem it necessary," may cut through the lands of others upon securing the consent of and making the agreed compensation to the owners of such other lands. (C. L. Sec. 25.) If such owners shall refuse to agree upon the value of such right of way, it is provided that three experts of known integrity shall be appointed by the proper justice of the peace to appraise the land (Sec. 26) and before appraising the same such experts shall ascertain "whether or not the ditch for which a new channel is solicited, is entirely destroyed and that the exorbitant labor or costs required to rebuild it renders its reconstruction absolutely impossible; and if in their opinion the injury done to such ditch may be repaired, they will so report to the justice of the peace and in such case the land solicited for the purpose of opening the ditch, *shall in no manner be touched;* but if they should be of the opinion *that a part of the ditch is irreparably destroyed* they shall then proceed to examine the land or lands over which the new ditch should be opened and the place where the said ditch should properly run." (Sec. 27.) While we are aware that this act is primarily for the purpose of extending to ditch communities the power of eminent domain and that the provisions above emphasized are primarily for the protection of parties whose land it is sought to condemn, against the improvident use of that power, we consider the statute as clearly indicating the legislative mind as to the circumstances under which the course of ditches may be abandoned. It in effect says that the right to condemn land to change the course of a public or community ditch shall be allowed under certain conditions and not otherwise. By the enumeration of the cases under which the right of way may be condemned, it excluded all cases where those conditions do not exist. As it is to be presumed that the legislature in providing a procedure for changing the course of a public ditch had in mind all classes where such change could be made, its making that procedure applicable only to certain conditions, is clearly

Candelaria v. Vallejos.

indicative that changes are not permissible unless such conditions exist. We therefore adopt as the condition under which a community ditch may be changed, the statutory expression that it is in cases where it is "absolutely impossible to reconstruct it," where a part of it is "irreparably destroyed." By this, we are not to be understood as meaning that the mere fact that the maintenance of the ditch in some other place will be less expensive or more convenient will justify its removal. Nor will the fact that it may once or twice in a season or oftener be destroyed by floods necessarily justify its removal. It must not be a matter of mere desirability or policy; that was presumably considered and settled when the community fixed the ditch. On the other hand, we do not consider a theoretical impossibility necessary. A practical impossibility will suffice. Cases might arise, for example, in which the construction of a ditch could be perpetuated in a given place by enlistment of extraordinary engineering resources quite beyond the means of the ditch owners. In cases such as these, while the impossibility is not absolute, it is practically so. If, to quote the terms of the statute, "the exorbitant labor and costs required to rebuild the ditch" render its re-construction impossible, that will suffice. It becomes thus a question to be determined upon the facts of each particular case. Applying these views to the allegations of the answer we are of opinion that the court below did not err in sustaining the demurrer. It is true that the answer in terms alleges that the floods flowing down said arroyo from year to year, have been so frequent as to render it pratically, if not entirely impossible to maintain said main ditch or Acequia Madre between the points referred to, but the reason given for this is because "the same would *no sooner be repaired* than another flood would destroy it." This shows that it is not impossible to re-build the ditch, but that on the contrary, it may be repeatedly re-built. The gist of the allegation is apparently the trouble in maintaining it, and upon the matter of maintenance we note that the concluding paragraph of the answer alleges not that to longer maintain said abandoned portion of said main ditch will "be a practical impossibility," but that it "will entail

loss and expense," thus showing that the maintenance is a mere matter of policy. In construing the answer we must assume, if not upon judicial notice at least in the absence of a contrary allegation, that the disturbing causes here named, to-wit, the arroyo and the flow therein during the rainy season, existed at the time the ditch was built no less than at present, and that in spite of these the ditch was maintained for nearly thirty years prior to the filing of this suit. We further take notice of the fact that in this Territory the encountering of arroyos in the course of acequias is a very common matter and that this condition is often met by flumes and in other cases by renewing the banks of the acequia after flood waters have run down the arroyo. We further find it a circumstance to be considered in construing this answer that the petition upon which the action of the defendant commissioners was taken, attached to defendants' answer as a part thereof, and embodying a number of reasons why the course of the ditch should be changed fails entirely to embody the reason now principally urged, to-wit, the difficulty or impossibility of disposing of the arroyo. We are aware that this is more properly a circumstance for consideration, along with other facts upon a hearing on the merits, but in construing a doubtful pleading it is not without weight.

From a careful examination of the answer we are of opinion that, fairly construed, it amounts simply to an averment that the further maintenance of the ditch across the arroyo will be attended with difficulty and expense. This does not, under the rules we have laid down above, make a case justifying a change in the ditch, against objection by the owners of land along the six mile strip, and the action of the court below upon this point was therefore right.

Defendants, carrying the demurrer back to the complaint, set forth in their brief several matters as to which it is urged the complaint fails to state facts sufficient to justify the relief prayed. It is urged that the complaint sets forth no ground for injunction, in that there is no sufficient allegation of irreparable damage. We think, however, that the complaint is ample to justify the grant-

ing of the relief prayed. It shows that the wrongful act of the defendants, if insisted upon, will deprive them of a valuable property right in water, will render some of their lands uncultivable, and will diminish or destroy their crops on other lands. It further shows that this damage will be continuous and that a multiplicity of suits, renewed from time to time in the future, will be necessary to secure from the defendants compensation in damages for the oft-repeated wrong. It is further alleged that the defendants are insolvent. This makes a case clearly calling for the writ of injunction. Davis v. Londgreen, 8 Neb. 43; Waddingham v. Robledo, 6 N. M. 347. The other points mentioned by defendants in their brief in criticism of the complaint are not argued, but we find nothing in them to justify the view that the complaint does not state a cause of action.

The judgment of the court below is affirmed.

Ira A. Abbott, A. J., concurs.

We dissent from the conclusions reached by the majority of the court, Edward A. Mann, A. J., John R. Mc-Fie, A. J.

MILLS, W. J.—I agree with the conlusion reached by the learned judge who wrote the opinion in this case, and I do so for the reason that the appellants when their answer was demurred to and the demurrer was finally sustained, elected to stand upon it, did not amend their answer, took no proofs, and the judgment of affirmance is warranted by the pleadings.

I cannot, however, concur in the reasoning of the court, by which the owner of one water right in an acequia out of a possible hundred, can prevent the ninety and nine from changing its location when it may be to the manifest advantage of all to make the change.

I do not believe that the course of an acequia, when once established, is as unalterable as the laws of the Medes and Persians; the lay-out of a highway can be changed when public convenience requires it, and I am unable to see why the course of an acequia is any more sacred than that of a highway, especially as the court after a hearing, when it considers it proper that a change in its location be made, can incorporate in the decree, pro-

visions which will amply protect all minority owners of land served by the waters of the ditch.

MANN, J.—(Dissenting.)   I cannot concur in the result attained by the majority of this court expressed in the exhaustive opinion written by Mr. Justice Pope, because I believe that such a result is arrived at through a mistaken conception of the relations of the parties constituting a community ditch and an erroneous construction of the laws governing such ditches.   I believe that if such construction is placed upon the acequia laws of the Territory, evil consequences will follow, in that a minority, even of one person, may control the reasonable wishes of the majority, cause unnecessary and unreasonable expense and inconvenience to the community and retard and impede the progress and advancement of the Territory.

Indulging what I take to be judicial knowledge and common custom, I conclude that a community of persons, like those of Santa Teresa and Colorado, desiring to irrigate their lands for their individual and common benefit of the community, by common consent entered upon an enterprise for the common good and for the benefit of each of those joining the enterprise, namely, to divert and convey water for the irrigation of their lands.   The primary object was the water, the thing that made their lands valuable and insured their daily bread, in that, each member personally acquired a property right which cannot be taken away.   The ditch was a community affair, it being merely the means of diverting and carrying the water.

In so far as the ditch is concerned, the members of this community were tenants in common and no individual acquired any "property right" to have it run in any particular place or channel, except as it would best serve the community at large.   If time demonstrated that a certain portion of the ditch was costing the community too much for is maintenance, that by reason of floods or other causes the established line was impracticable, that during the very months of the year when water was obtainable for irrigation, a portion of the ditch was destroyed and the crops of a large majority of the interested community were being lost for want of water, can one man, or a few men, prevent the majority of those in interest from cor-

recting the mistake and changing the ditch so as to avoid these calamities, when, by so doing, the minority are not deprived of water but are in fact benefited by the change?

All these facts appear in the answer and are admitted by the demurrer, yet it is held that the change cannot be made unless it appears that it is "practicably impossible" to maintain the ditch on the old line. If such be the law, then the mistake of the builders of the original acequia can never be rectified, no matter if the loss sustained by the majority be so great as to well nigh make their lands valueless, and the community for which and by whom the same was built must forever suffer, because, forsooth, the original builders knew nothing of engineering and placed a portion of the canal on an unfortunate line, unless the whole community of perhaps a hundred or more persons unanimously consent to the change, a thing which is most unlikely to occur. The idea seems to me preposterous. The very name "community ditch," implies the good of the community as represented by the majority of those in interest, rather than the minority, or the individual. How does the individual land owner, whose only interest in the main ditch is to have his portion of the water carried to some convenient point where it may be discharged upon his land, acquire a property right to have the main ditch run in any particular place, whether it be on his land or a half mile from it? What is the nature of his property right? The laws of the Territory make every natural stream a public acequia, and yet the water in that stream may be appropriated, diverted from its natural course and carried elsewhere for irrigation purposes, regardless of the land owners through, by, or near whose land it flows. Tenants in common in property are, and of necessity must be governed by the will of the majority as to the control and management of the common property.

A good deal is said in the opinion of the majority in this case of the sanctity of contract and the confiscation of property; but I insist that no contract existed except that of tenancy in common in the acequia.

"Where a ditch, through which water is diverted and applied to any beneficial purpose, is owned by several

proprietors, and their relation is not defined by special agreement to the contrary, they are to be regarded as tenants in common of the ditch, and their rights are determined and governed by the rules of law regulating tenancy in common." Kinney on Irrigation, Sec. 301, page 483), citing Bradley v. Harkness, 26 Cal. 69; Jones v. Parsons, 25 Cal. 100; Reed v. Spicer, 27 Cal. 63; Carpenter v. Webster, 27 Cal. 524; Park v. Kilham, 8 Cal. 77; Duryea v. Burt, 28 Cal. 587; Decker v. Howell, 42 Cal. 642; McConnell v. Denver, 35 Cal. 369.

A majority of such tenants in common have the right to control the management of affairs of the ditch. Kinney on Irrigation, Sec. 304; Abel v. Love, 17 Cal. 233.

No contractual relations existed, then, between the original builders except those well-defined relations existing between tenants in common in so far as the ditch, the common property, was concerned; and this, it seems to me, answers the questions of sanctity of contract and property rights in the main ditch. If, then, this was the original status of the parties or members of the community, how were such relations affected by the act of the Legislature of February 28, 1895, and the acts amendatory thereto? The first section of that act (compiled as Sec. 8, C. L. 1897), is as follows:

"All community ditches, or acequias, now constructed, or hereafter to be constructed in this Territory, shall, *for the purposes of this act,* be considered as corporations, or bodies corporate, with powers to sue and be sued as such."

Then follow various sections relating to the regulation of such ditches, the election and powers of its officers, the assessment of fatigue work, etc., and the commissioners are given general charge and control of all affairs pertaining to such ditches. True, these laws have been from time to time amended, but the act and its amendments all pertain to the regulation and control of such ditches, and defining their rights as such community ditches. To my mind, the legislature had in mind only the general status of such communities; it endeavored to place them on a uniform base, giving them the right to sue and be sued under the community name, without hav-

Candelaria v. Vallejos.

ing to join numerous parties; naming officers upon whom service might be made, and reorganizing by legislative enactment rights and relations already existing. I apprehend that no individual in a community ditch existing at the passage of that act acquired any right not already vested in him, or lost any existing right. I do not think that any change as to the relations existing between the members of such community then took place; but rather such act and the amendments thereto are mere regulations of the government of such communities, and fixing their legal status for the convenience of themselves and those having business relations with them.

I agree with the learned justice, who wrote the majority opinion, that no property rights were, or could be, taken away from the community by the legislature; and I go further and say that the tenancy in common of the ditch itself, which existed prior to the act still exists, and the status of the parties remains unchanged.

The answer fully sets up a condition of affairs that was disastrous to the community. It shows that the community was hampered and its interests suffered by reason of the bad location of the main ditch on its original line, that a large majority of the community recognizing that the common property was not accomplishing the purpose for which it was intended, changed a portion of the line so as to overcome the difficulty, and have been demonstrating for some years the wisdom of the change by actually watering all the lands of the community and avoiding the evil and disastrous consequences arising from the attempted maintenance of the old ditch; that no person lost his water right or was even put to any considerable expense by the change; that plaintiffs are not injured by it, and cannot be; and all these allegations are admitted by the demurrer. The only question, then it seems to me, for our decision is this. Can a minority in interest in a community ditch prevent, by injunction, the majority from changing a portion of the ditch from an ill-advised location, which does not and cannot satisfactorily irrigate all the community lands at all times when there is a sufficient water in the stream, to a different locality where the difficulties are overcome and the ditch maintained at much

less expense to the community, provided, that no one having a water right is thereby deprived of such right or put to great expense by the change?

To this, it seems to me, there can be but one answer. Neither law nor equity will aid a stubborn minority in preventing the majority from doing an act for the manifest good of the whole community, where no one is injured, but all are benefited. True, equity will, and should, intervene to protect the rights of the minority from abuse by the majority; but upon the answer in this case, as admitted for the purposes of the demurrer, no such condition exists.

In my judgment, the cause should have been reversed and remanded for further proceedings.

M'FIE, J.—I concur in the doctrine announced in the above opinion as to the rights of the majority, and also dissent from the doctrine announced in the majority opinion.